# EXHIBIT 4

On behalf of: Part 20 Defendants
Witness: Joshua Craig Wander
No: First
Exhibit: JCW1
Date: 12 January 2024

**IN THE HIGH COURT OF JUSTICE**                    **CL-2020-000358**

**BUSINESS AND PROPERTY COURTS**

**OF ENGLAND AND WALES**

**COMMERCIAL COURT (KBD)**

**B E T W E E N**

**ALEXANDER GORBACHEV**

<u>**Claimant**</u>

**-and-**

**ANDREY GRIGORYEVICH GURIEV**

<u>**Defendant/Part 20 Claimant**</u>

**(1) PARK STREET LITIGATION SERVICES LP**
**(a company incorporated in Jersey)**

**(2) SPHINX FUNDING LLC**
**(a company incorporated in Delaware, USA)**

<u>**Part 20 Defendants**</u>

---

**FIRST WITNESS STATEMENT OF**

**JOSHUA CRAIG WANDER**

---

I, **JOSHUA CRAIG WANDER**, of 600 Brickell Ave, 19th Floor, Miami, FL 33131, United States, say as follows:

**A.        Introduction**

1        I am the managing partner and co-founder of 777 Partners, an alternative investment company based in Miami, Florida, USA.  The Second Part 20 Defendant in this matter ("**Sphinx**") is a subsidiary of 777 Partners. I have overall responsibility within 777 Partners for our litigation funding investments, and in that capacity, I am providing services to Sphinx in respect of its investment in these English proceedings (the "**Proceedings**"). I have authority to make this witness statement on behalf of Sphinx.

2        I make this statement in response to the application by the Part 20 Claimant ("**Mr Guriev**") under CPR 25.14, for security for costs against Sphinx and the First Part 20 Defendant ("**PSL**"), in respect of the claims brought against Mr Guriev by the Claimant, to whom I refer in this statement as "**Alexander**".

**G2.3/2/1**

3       The facts and matters set out in this witness statement are within my own knowledge, unless otherwise stated, and are true to the best of my knowledge, information and belief. Where I refer to information supplied by others, the source of the information is identified. Facts and matters derived from sources other than my own knowledge are true to the best of my knowledge, information and belief.

4       This witness statement has been prepared following calls and emails with Macfarlanes LLP, legal representatives for Sphinx and PSL. Following these communications, a written draft of this statement was produced by Macfarlanes LLP derived from the contents of those communications, which I reviewed and commented on.  As noted above, this statement is based on my own knowledge and recollection.  Where I refer in this witness statement to communications between myself and Alexander and/or his legal representatives in these Proceedings, I do not intend (and am not authorised by Alexander) to give any waiver of legal privilege in any such communications. I also do not give any waiver of privilege belonging to Sphinx or PSL in this statement.

5       There is now produced and shown to me a paginated bundle of copy documents marked "JCW1". References in this witness statement to "**JCW1**" are in the format [**JCW1/page number**].

6       I have read the Fourth and Fifth Witness Statements of Trevor Mascarenhas of PCB Byrne ("**PCB**") and, where appropriate, I refer in this statement to documents contained in Exhibits TAM3 and TAM4 to Mr Mascarenhas's statements.

**B.      Background**

7       Sphinx has been involved as a funder of claims of Alexander against Mr Guriev since March 2021. Prior to Sphinx's involvement, another funder called Marholm Limited ("**Marholm**") initially agreed to fund claims of Alexander against Mr Guriev and certain personal expenses from approximately 2016 onwards.  In those early days, claims were brought in the Cypriot Courts.  Later, in March 2019, with the scope of the dispute between Alexander and Mr Guriev expanding to include claims brought by Alexander in England, PSL and other entities in PSL's group (which I refer to collectively as "**Park Street**") agreed to fund certain of Alexander's costs and expenses in these Proceedings.

8       In March 2021, with the anticipated costs of the Proceedings rising, at the request of Park Street, Sphinx agreed to fund part of Alexander's costs in these Proceedings, as well as his general living and certain other expenses, in return for an economic interest in the outcome of the Proceedings if Alexander's claim succeeds. The commercial terms on which Sphinx agreed to provide funding are privileged, confidential and commercially sensitive.

**C.      Funding and Insurance**

9       Although I am not a lawyer, I am aware from my general experience of litigation funding that in English proceedings, the Court can make an order for security for costs against a litigation funder that provides funding for claims in return for a financial interest in the outcome of the litigation.

10      In March 2021, an after the event insurance policy (the "**ATE Policy**") was purchased by Sphinx with an indemnity limit of £5,000,000, which we understood at the time to be sufficient cover to protect the Funders against the risk of an adverse costs order being made against Alexander in the Proceedings.   Alexander's lawyers, CMS Cameron McKenna Nabarro Olswang ("**CMS**") had arranged the ATE Policy and had informed the Funders of the amount of costs cover that Alexander would require.

11      Sphinx has provided £11,872,546 under its arrangement with Alexander.  I am not in a position to say how much of this sum has been used for costs and expenses of the English proceedings, due to the manner in which payments have been made.  Sphinx has made payments in lump sums in advance to CMS, which has then allocated those sums for various purposes, including in relation to the costs and expenses of the Proceedings, the cost of the ATE Policy, living expenses and tax costs of Alexander and the discharge of debts owed by Alexander to third parties. It has been confirmed to me by CMS that it no longer holds any sums provided by Sphinx on its client account, but Sphinx have never been given an account showing precisely how all of its funds have been utilised.   I understand that of the total amount provided by Sphinx, around £2,000,000 of that sum has been used to pay off Alexander's creditors, which have either brought or threatened bankruptcy proceedings.  In addition, on 1 November 2023, Sphinx purchased a debt from one of Alexander's creditors directly, in order to prevent the creditor harming Alexander's position in these Proceedings.

12      It is said at paragraph 4(g)(i) of Mascarenhas 4 that on 12 October 2023, CMS disclosed that certain historic funding payments due to Alexander from Sphinx were paid by a related entity, 777 Partners LLC ("**777**"), with the same contact details as for Sphinx. Although it is correct that certain funds were paid to CMS from 777, they were paid by 777 on behalf of and in discharge of Sphinx's contractual obligations to Alexander.  777 has no entitlement to any stake in the outcome of the Proceedings and never has.

13      I should make clear that whilst Sphinx and 777 have access to substantial resources, their financial arrangements are fairly complex and I anticipate that Mr Guriev's lawyers will inevitably say they are not satisfied as to any disclosure and explanations I might give as to Sphinx's ability to meet a costs order. I therefore do not go into Sphinx's and 777's financial arrangements in this witness statement, and I accept that this means that Sphinx will not resist Mr Guriev's application on the ground that any costs order can readily be enforced against Sphinx.

**D.      Dispute with Alexander**

14      In March 2023, issues arose in the relationship between the Funders and Alexander. As a result, Sphinx did not make payment of the funding instalment due on 31 March 2023, and to the best of my knowledge none of the Funders has made any payment or authorised the use of any funds already provided in relation to the costs and expenses of the Proceedings after 30 May 2023 (which was the date of CMS' receipt of the last payment made by Sphinx to CMS, which I understand was used to discharge a costs order and to pay some of CMS' fees). The details of the dispute are the

subject of a confidential arbitration, and I do not refer further to the contents of that arbitration here, save to say that the Funders' position is that they are not obliged to fund any further costs (and absent some fundamental change in circumstances they do not intend to fund any further costs), and Alexander's position is that the Funders are not entitled to any return from any proceeds of this litigation and the arrangements between Alexander and the Funders are at an end.

15    CMS stopped providing the Funders with regular updates on the Proceedings in March 2023.  Prior to this date, the Funders were kept informed by CMS on a relatively regular basis as to material developments in the case, either on calls or in meetings.  CMS have conducted the Proceedings on Alexander's behalf without reference to the Funders since the end of July 2023, and we have no ongoing involvement, input or any kind of regular updates on the progress of the case from either Alexander or CMS.

16    It is not clear to me how Alexander has been or is now funding his legal costs and expenses, although I am told by CMS that Alexander has been taking steps to arrange alternative funding. He may already have obtained such funding.  I do not know whether CMS has informed Mr Guriev that any other funders are involved in funding the Proceedings or if they too are to be subject to any application for security for costs.

**E.    Mr Guriev's Application for Security for Costs**

*Service of the application*

17    The Application was served on Sphinx in two ways: first, by personal service on the registered agent of Sphinx in Delaware; second, by electronic means by HM Courts & Tribunal Service in accordance with Article 10(a) of the Hague Convention 1965 on 8 January 2024 [**JCW1/2-3**].  Sphinx instructed Macfarlanes LLP to act for it on the Application and the parties agreed that evidence responsive to the application would be served by 12 January 2024.  Sphinx makes no challenge as to the validity of service of the application on it or as to the jurisdiction of the English Court to deal with this matter.

18    At paragraph 27 of his witness statement, Mr Mascarenhas criticises the Funders for having failed to engage substantively with the Application prior to service. I do not think this criticism is merited. It was Mr Guriev's obligation to serve his Application in accordance with the Court rules, and the Funders have done no more than to insist that Mr Guriev serve the Application in accordance with those rules.  I should also add that the Funders did not approve CMS' letter of 9 October 2023 by which contact details of the Funders were provided to Mr Guriev's lawyers.

19    As Mr Mascarenhas correctly recognises, neither Marholm (as far as I am aware) nor 777 has provided any funds to Alexander for use in the English Proceedings in return for a share of the proceeds. Nor has Sphinx or PSL (as far as I am aware) provided any funds to Alexander or authorised the use of any funds already provided in connection with these Proceedings since 30 May 2023.

20      According to a letter from Mr Guriev's lawyers, PCB Byrne ("**PCB**") dated 16 June 2023, CMS was informed that as at 16 June 2023, "[y]*our current adverse costs coverage of £5,000,000 will shortly be exceeded*" [**TAM3/44-46**].  It follows from Mr Guriev's lawyers' own admission that during the time that the Funders funded the Proceedings, there was always an adequate level of security in place for the costs incurred by Mr Guriev up to that date.  I will leave it to my counsel to make submissions on this point, including as to the effectiveness of the ATE Policy given Mr Guriev's status as a sanctioned person.

21      It is said at paragraph 33 of Mr Mascarenhas's fourth statement that Alexander "*implicitly accepted that £10m of security was appropriate when he sought to obtain increased insurance to cover that sum*". Whatever the views of Alexander, this is not a view shared by the Funders. In a letter from our lawyers, Macfarlanes on 9 January 2024, we asked a series of questions relating to the incurred and estimated costs of Mr Guriev in the Proceedings [**JCW1/4-6**].  PCB responded the same day, expressing some frustration at what they perceived to be delaying tactics [**JCW1/7-9**]. What PCB and Mr Guriev perhaps do not know or appreciate is that there is a breakdown in the relationship between Alexander and the Funders such that the Funders are no longer privy to developments in the Proceedings and information and documentation shared with Alexander does not equate to information and documentation shared with the Funders. In any event, Alexander is not authorised to speak for the Funders or to bind them to any position as to any figure.

22      For the avoidance of doubt I should say that I have seen (in the exhibit to Mr Mascarenhas' fourth witness statement) the letter from CMS dated 30 June 2023, in which they stated (on behalf of Alexander) that Mr Guriev's "*incurred and estimated costs are extraordinarily high*", and that Alexander considered that the ATE Policy "*is more than adequate to cover [Mr Guriev's] reasonable and proportionate costs*" [**TAM3/50-52**]. While Mr Mascarenhas' fourth witness statement refers, at paragraph 33, to an implicit '*concession*' by Alexander that the amount of security sought by Mr Guriev was reasonable, the Funders did not approve or endorse any such concession by Alexander, and in my view Mr Guriev's costs appear to be very high. As noted above, on 9 January 2024 Macfarlanes wrote to Mr Guriev's solicitors to seek information to fill in the gaps in Mr Mascarenhas' account of the reasons for the level of Mr Guriev's costs, but they were met with a series of refusals.

23      In any event, as Mr Mascarenhas correctly predicted, Sphinx's position is that it would not be just for security for costs to be ordered against Sphinx and PSL above and beyond the cover provided by ATE Policy for the following reasons:

23.1    For the period that funding was provided for the Proceedings by PSL and Sphinx, there was at all times and there remains an adequate amount of security in place in the form of the ATE Policy;

23.2    Mr Guriev has failed to adequately explain why his costs estimate to trial is reasonable;

23.3    Since 30 May 2023, the Proceedings have been continued otherwise than by the resources of Sphinx or PSL. If any other parties are causing Mr Guriev to incur recoverable costs in excess of

G2.3/2/5

the limit secured by the ATE Policy, it would not be just in all of the circumstances for Sphinx or PSL to be the subject of an order for additional security for costs;

23.4    Mr Guriev has delayed in making the security for costs application. For all Mr Mascarenhas' complaints about alleged delaying tactics of the Funders, Mr Guriev brings his application with less than 3 months prior to the commencement of trial, when he could have brought it much earlier.

*Sanctions*

24    It is said by Mr Mascarenhas at paragraph 32 of his fourth statement that Sphinx may resist enforcement of any costs order on the basis that to pay any such costs would be in breach of US sanctions.  In response to this I can say that Sphinx will always abide by US and any other applicable sanctions law and will, where permitted, seek licences as appropriate.

*Compliance with orders of this Court*

25     Although I have not relied on Sphinx's ability to meet a costs order in due course as a reason why Mr Guriev should not have a further order for security for costs, I wish to make clear that Sphinx is a reputable litigation funder that abides by Court orders.

**Statement of truth**

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed:

DocuSigned by:

1D763C43EC58465...

Joshua Craig Wander

Dated:          12 January 2024

6

**G2.3/2/6**